## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| SHANTELL ALLEN on behalf of her five children S.A., C.A.1, C.A.2, D.B.1, and D.B.2, *individually and on behalf of all others similarly situated*; | CASE NO. 2:22-cv-359-PPS-JPK |
| and | District Judge<br>Hon. Philip P. Simon |
| S.A. by next friend Shantell Allen, C.A.1 by next friend Shantell Allen, C.A.2 by next friend Shantell Allen, D.B.1 by next friend Shantell Allen, D.B.2 by next friend Shantell Allen, A.J.1 by next friend Angela Owens, A.J.2 by next friend Angela Owens, Z.S by next of friend Autumn Bracey-Stevens, D.D. by next of friend Autumn Bracey-Stevens, D.H. by next of friend Autumn Bracey-Stevens, and N.M. by next of friend Fatin Muhammed, | Magistrate Judge<br>Hon. Joshua P. Kolar |
| Plaintiffs, | **CLASS ACTION** |
| v. | **JURY DEMANDED** |
| E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, HAMMOND GROUP, INC., HAMMOND LEAD PRODUCTS, LLC, HALSTAB, LLC, and HALOX, LLC, | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

SHANTELL ALLEN on behalf of her five minor children S.A., C.A.1, C.A.2, D.B.1, and

D.B.2 and D.H., individually and on behalf of all others similarly situated; A.J.1 by next friend

Angela Owens, A.J.2 by next friend Angela Owens, Z.S by next of friend Autumn Bracey-Stevens,

D.D. by next of friend Autumn Bracey-Stevens, D.H. by next of friend Autumn Bracey-Stevens,

and N.M. by next of friend Fatin Muhammed (collectively "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint and make these allegations based on information and belief against Defendants E. I. du Pont de Nemours and Company; the Chemours Company; Hammond Group, Inc.; Hammond Lead Products, LLC; Halstab, LLC and Halox, LLC. (collectively "Defendants"):

## **INTRODUCTION**

*"No safe blood lead level in children has been identified. Lead exposure can affect nearly every system in the body."*

-National Center for Environmental Health, Division of Emergency and Environmental Health Services[1]

This is an action seeking individual and class status for damages for personal injuries and medical monitoring for a community of residents, adults and minors, who, were unwittingly exposed for years, decades for some, because they had the happenstance of residing in a subsidized housing complex constructed on top of toxic land, the footprint of the former Anaconda Facility and as a result were unknowingly exposed to very high levels of lead, arsenic, and other toxic substances left in place by the Defendants in this case. The Defendants, as the owners of these polluting industries, had superior knowledge of the toxins, are the only entities with the institutional knowledge of its use and historical records of it, and therefore are the sole entities who have actual knowledge of the arsenic and lead left on the site and surroundings.

At critical times during gestation and/or their developmental years and to the present, the minor plaintiffs were exposed to damaging levels of lead, arsenic, and other toxic substances. This complaint seeks medical monitoring as result of exposure for these minor plaintiffs.

1.      The Plaintiffs named herein are victims of the corporate Defendants' decades of

---

[1] https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (Accessed 8/26/21)

rampant pollution of the land upon which the Plaintiffs lived. They bring this case for the profound and tragic physical and economic injuries caused by the Defendants' decades of negligent, reckless, and intentional release of dangerously large amounts of toxins into the environment that have contaminated property located in Lake County, Indiana, where the Plaintiffs used to live. After a century of abuse, this contamination of lead, arsenic, and likely other substances has reached a point where it has not only wreaked havoc on the property in the region, but has caused serious, life-altering injuries to the people.

2.     This action is brought in accordance with the dictates set forth by the Indiana Supreme Court, which has recognized:

> A business should bear its own costs, burdens, and expenses of operation, and these should be distributed by means of the price of the resulting product and not shifted, particularly, to small neighboring property owners for them to bear alone. We can understand no sensible or reasonable principle of law for shifting such expense or loss to persons who are not involved in such business ventures for profit. Industrial development is to be encouraged, not at the expense of private individuals without their consent, but by the price of the resulting product in the industry itself.

*Enos Coal Mining Co. v. Schuchart*, 243 Ind. 692, 697, 188 N.E.2d 406, 408 (1962); *see also Shell Oil Co. v. Meyer*, 684 N.E.2d 504, 517 (Ind. Ct. App. 1997); *Mowrer v. Ashland Oil & Refining Co.*, 518 F.2d 659, 662 (7th Cir. 1975) (applying Indiana law).

3.     Dating back to 1906, industrial uses of land in the City of East Chicago have resulted in an untold impact upon the environment. At issue here is a piece of land designated by the U.S. Environmental Protection Agency ("EPA") as the U.S. Smelter and Lead Refinery, Inc. Superfund Site (the "Site"). The U.S. Smelter and Lead Refinery, Inc. (USS Lead) formerly operated on a 79-acre tract of property at 5300 Kennedy Avenue in East Chicago, Lake County, Indiana. The Indiana Harbor Belt Railroad is to the north of the site, the east-west toll road, and the east branch of the Grand Calumet River to the south, Kennedy Avenue to the east and Indiana

Harbor Canal to the west. It lies within the flood plain of the Grand Calumet River.

4.      The Site and the area surrounding it were operated by numerous corporate entities, including U.S. Smelter and Lead Refinery, Inc., Anaconda Lead Products, E. I. du Pont de Nemours and Company, and Hammond Lead Products, Inc.

5.      Through the operation of their manufacturing facilities, these various corporate entities and others have negligently and wantonly polluted not only their corporate property, but the residential lands surrounding their facilities, exposing innocent residents and future generations to hazardous byproducts and waste.

6.      Despite their knowledge of the dangers to health and wellbeing posed by their environmental contamination, the polluting companies failed to warn area residents, including without limitation the Plaintiffs, of these extreme dangers. These companies actively concealed from Plaintiffs the fact and extent of their pollution and the dangers it posed. As a result, the Plaintiffs – a vast majority of whom are children – lived and played on what is essentially a toxic waste dump with no knowledge of the dangers to which they were being continually exposed.

7.      As a direct result of the Defendants' failures to warn and active concealment of these dangers, the residents of the Site have only recently discovered that they have been exposed to hazardous materials including without limitation lead and arsenic and that the soil on the Site is heavily contaminated.

8.      This action is brought against the entities who have either been the direct cause of the contamination or have stepped into the shoes of those who did.

9.      This action is also brought against those entities who knew of the danger and stood silent, at times even drawing a direct benefit from that silence, while Plaintiffs and others were left unknowingly subjected to toxic substances that have caused permanent physical, emotional, and

mental injuries, as well as direct economic damages.

10.     Plaintiffs bring claims against Defendants E. I. du Pont de Nemours and Company; The Chemours Company; Hammond Group, Inc.; Hammond Lead Products, LLC; Halstab, LLC; and Halox, LLC for strict liability, negligence, negligent infliction of emotional distress, private nuisance, medical monitoring and punitive damages.

## PLAINTIFFS

11.     The Plaintiffs are previous occupants of residential property located in Lake County, Indiana, who have occupied a residence on the West Calumet Housing Complex; and/or individuals who attended school or other programs at the Carrie Gosch Elementary School.

### Class Representatives with Individual Personal Injury

12.     Plaintiff S.A., by and through her next of friend and mother, Shantel Allen, resided at a residence on the Site. S.A. attended the Carrie Gosch Elementary School and played outdoors at the school. S.A. has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. S.A. suffers from conditions including learning impairment, memory loss, irritability, difficulty sleeping, loss of appetite, and headaches. S.A. has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, S.A. has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms,

Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

13.     Plaintiff C.A.1, by and through his next of friend and mother, Shantel Allen, resided at a residence on the Site. C.A.1 attended the Carrie Gosch Elementary School and played outdoors at the school. C.A.1 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. C.A.1 suffers from conditions including irritability, hyperactivity, constipation, headaches, loss of balance, and pain, numbness or tingling in legs, arms, hands and/or feet. C.A.1 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, C.A.1 has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

14.     Plaintiff C.A.2, by and through her next of friend and mother, Shantel Allen, resided at a residence on the Site. C.A.2 attended the Carrie Gosch Elementary School and played outdoors at the school. C.A.2 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. C.A.2 suffers from conditions including memory loss, headaches, pain, numbness or tingling in legs, arms, hands or feet, memory loss, irritability, hyperactivity, abdominal pain, loss of appetite, headaches, lethargy, loss of balance, and anemia. C.A.2 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological

manifestations, C.A.2 has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

15.    Plaintiff D.B.1, by and through her next of friend and mother, Shantel Allen, resided at a residence on the Site. D.B.1attended the Carrie Gosch Elementary School and played outdoors at the school. D.B.1 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. D.B.1suffers from conditions including irritability, hyperactivity, difficulty sleeping, loss of appetite, headaches, loss of balance, fainting, pain, numbness or tingling in legs, arms, hands, and feet, muscular weakness, and anemia. D.B.1 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, D.B.1 has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

16.     Plaintiff D.B.2, by and through his next of friend and mother, Shantel Allen, resided at a residence on the Site. D.B.2 attended the Carrie Gosch Elementary School and played outdoors at the school. D.B.2 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. D.B.2 suffers from conditions including learning problems, speech impairment, memory loss, decreased IQ and mental aptitude, irritability, personality change, hyperactivity, loss of appetite, weight loss, headaches, loss of balance, pain, numbness or tingling in legs, arms, hands and feet, anemia, and swelling of feet and hands. D.B.2 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, D.B.2 has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

## Plaintiffs with Individual Personal Injury

17.     Plaintiff A.J.1 by and through her next of friend and mother, Angela Owens, resided at a residence on the Site. A.J.1 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. A.J.1 suffers from conditions including learning problems, irritability, hyperactivity, vision problems, and asthma. A.J.1 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, A.J.1 has experienced and/or suffered an increased risk of experiencing one or more of the following

injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

18.     Plaintiff A.J.2, by and through his next of friend and mother, Angela Owens, resided at a residence on the Site. A.J.2 attended the Carrie Gosch Elementary School and played outdoors at the school. A.J.2 has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. A.J.2 suffers from conditions including speech impairment, irritability, hyperactivity, headaches, vision impairment, and asthma. A.J.2 has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, A.J.2 has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

19.     Plaintiff Z.S., by and through her next of friend and mother, Autumn Bracey-Stevens, resided at a residence on the Site. Z.S. has ingested, inhaled, and had direct dermal contact

with surface and subsurface soils. Z.S. suffers from conditions including learning impairment and Decreased IQ and bad mental aptitude. Z.S. has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, Z.S. has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

20.     Plaintiff D.D., by and through his next of friend and mother, Autumn Bracey-Stevens, resided at a residence on the Site. D.D. attended the Carrie Gosch Elementary School and played outdoors at the school. D.D. has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. D.D. suffers from conditions including irritability, personality change, aggression, abdominal pain, and small stature. D.D. has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, D.D. has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling

in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

21.     Plaintiff D.H., by and through his next of friend and mother, Autumn Bracey-Stevens, resided at a residence on the Site. D.H. has ingested, inhaled, and had direct dermal contact with surface and subsurface soils. D.H. suffers from conditions including irritability, decreased IQ and mental aptitude, personality change, hyperactivity, nausea, abdominal pain, loss of appetite, small stature, vision impairment, muscular weakness, and lung disease. D.H. has suffered emotional distress, anguish, and pain and suffering. With respect to physical, medical, and neurological manifestations, D.H. has experienced and/or suffered an increased risk of experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

22.     Plaintiff N.M., by and through his next of friend, Fatin Muhammad, resided at a residence on the Site. N.M. attended the Carrie Gosch Elementary School and played outdoors at the school. N.M. has ingested, inhaled and had direct dermal contact with surface and subsurface soils. N.M. suffers from conditions including ADHD, depression, frequent ear infections, and muscle weakness. N.M. has suffered emotional distress, anguish, and pain and suffering. N.M. will require future and ongoing medical testing due to their exposure. With respect to physical, medical, and neurological manifestations, N.M. has experienced and/or suffered an increased risk of

experiencing one or more of the following injuries: Learning Impairment; Speech Impairment; Memory Loss; Decreased IQ and Mental Aptitude; Irritability; Personality Change; Hyperactivity; Aggression; Difficulty Sleeping; Nausea; Vomiting; Abdominal pain; Constipation; Loss of Appetite; Weight Loss; Small Stature/Stunted Growth; Headaches; Lethargy; Convulsions; Loss of balance; Fainting; Coma; Paralysis; Hearing Impairment; Vision impairment; Pain, Numbness or Tingling in Legs, Arms, Hands and/or Feet; Muscular Weakness; Anemia; High Blood Pressure; Heart Disease; Lung Disease; Kidney Damage; Birth Defects; and/or Cancer.

## **DEFENDANTS**

23.     Defendant E. I. du Pont de Nemours and Company is a Delaware for-profit corporation authorized to do business in the State of Indiana. Its Registered Agent is CT Corporation System, 150 West Market Street, Indianapolis, Indiana 46204.

24.     Defendant The Chemours Company is a Delaware for-profit corporation authorized to do business in the State of Indiana. Chemours is a subsidiary of Its Registered Agent is CT Corporation System, 150 West Market Street, Indianapolis, Indiana 46204. Chemours is a subsidiary of DuPont, which has assumed DuPont's responsibilities under the Consent Decree.

25.     Recently, E. I. du Pont de Nemours and Company restructured itself and created The Chemours Company as a separate company.

26.     The Chemours Company has assumed at least some portion of E. I. du Pont de Nemours and Company's liability.

27.     E. I. du Pont de Nemours and Company and The Chemours Company are collectively referred to throughout this Complaint as "DuPont."

28.     Defendant Hammond Group, Inc. is an Indiana for-profit corporation formerly named Hammond Lead Products Inc. Its Registered Agent is Stephen A. Bolanowski Jr., 1414

Field Street, Building B, Hammond, Indiana 46320.

29.     Defendant Hammond Lead Products, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Stephen A. Bolanowski Jr., 1414 Field Street, Building B, Hammond, Indiana 46320.

30.     Defendant Halstab, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Hammond Group, Inc. c/o Stephen A. Bolanowski Jr., 1414 Field Street, Building B, Hammond, Indiana 46320.

31.     Defendant Halox, LLC is an Indiana limited liability company and is a subsidiary of Hammond Group, Inc. Its Registered Agent is Stephen A. Bolanowski, 1414 Field Street, Building B, Hammond, Indiana 46320.

32.     Hammond Group, Inc., Hammond Lead Products, LLC, Halstab, LLC, and Halox LLC are collectively referred to throughout this Complaint as "Hammond Lead."

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### Pollution of the Site by USS Lead

33.     In or about 1906, construction of industrial buildings began on and around the Site.

34.     From 1906 to 1920, much of the land on and around the Site was primarily owned and operated by the Delmar Copper Refinery Company to produce and smelt copper.

35.     In 1920, a portion of the land on and around the Site previously owned by the Delmar Copper Refinery Company was acquired by U.S. Smelting, Refining, and Mining, and later transferred to U.S. Smelter and Lead Refinery, Inc. ("USS Lead").

36.     Among other activities, USS Lead operated a primary lead smelter on 25 acres of its property.

37.     In 1973, USS Lead converted to secondary smelting, recovering lead from scrap

metal and old automobile batteries.

38.     USS Lead continued in this capacity until ceasing operations on the USS Lead Superfund Site in or about December 1985.

39.     USS Lead's smelting operations produced waste materials such as blast furnace slag and lead-containing dust emitted by the blast furnace stack and rooftop vents.

40.     USS Lead piled and spread the blast furnace slag, which contained lead and other hazardous substances, on its property adjacent to the Site.

41.     The lead-containing dust from the blast furnace stack was stockpiled on USS Lead's property adjacent to the Site, covering as much as five (5) acres of the property.

42.     In 1975, USS Lead obtained a permit permitting limited discharge of furnace cooling water and storm water run-off into the Grand Calumet River.

43.     USS Lead received a second permit in 1985. Throughout the years that USS Lead possessed permits, USS Lead frequently and routinely exceeded the permitted discharge amounts.

44.     USS Lead filed for bankruptcy in 1987.

45.     Upon information and belief, there is no evidence that USS Lead, or its successors in interest, took any measures whatsoever to remediate or address the vast contaminated wasteland created by the operations of its facility.

**Pollution of the Site by DuPont**

46.     DuPont's manufacturing of lead arsenate insecticide at its East Chicago facility also contributed to pollution of the Site.

47.     DuPont owns property abutting the Site and the property owned by USS Lead.

48.     From 1910 to 1949, DuPont operated a facility adjacent to USS Lead, which manufactured lead arsenate insecticide.

14

49.     Historically, DuPont's facility on and around the Site was used to manufacture the pesticide lead arsenate.

50.     Through operation of its facility and use of its property, DuPont has caused hazardous substances such as lead and arsenic to contaminate the Site.

## Pollution of the Site by Hammond Lead

51.     Hammond Lead's manufacturing operations at two locations to the south of the Site have also contributed to its contamination with hazardous substances.

52.     The two Hammond Lead properties are known as the Halstab Division and as the Halox Division.

53.     Hammond Lead has used the two properties to produce lead substances since 1930.

54.     Hammond Lead's manufacturing processes result in lead particles and substances contamination due to transport of the hazardous substances through air emissions.

55.     Through operation of its facility and use of its property, Hammond Lead has caused hazardous substances such as lead and arsenic to contaminate the Site.

56.     This contamination is evidence by an environmental assessment commissioned by USS Lead in the year 2000.

57.     The assessment summarized its findings and conclusions in a document titled "Independent Assessment of the Impacts of Historical Lead Air Emissions in East Chicago, Indiana" (the "Independent Assessment").

58.     A copy of the Independent Assessment was furnished to the EPA.

59.     The Independent Assessment concluded that Hammond Lead's manufacturing operations were a substantial contributor to the lead contamination of the Site.

## West Calumet Housing Complex

60.     In the early 1970s, the East Chicago Housing Authority constructed low-income residential units on the Site (the "West Calumet Housing Complex").

61.     The West Calumet Housing Complex is comprised of three-story apartment buildings and brick duplexes with large lawns on the old Anaconda plant site to provide housing for low-income residents.

62.     As associated reporters Sara Burnett and Jason Keyser aptly stated in a September 2016 article: "Modern-day sensibilities would reject such an idea, but when the East Chicago Housing Authority was searching for sites, Executive Director Benjamin Lesniak said there was little available land except 'in vacant areas which are surrounded by industries and undesirable residential areas,' according to a 1966 Chicago Tribune article."

63.     In 2016-2017, Calumet lost more than 1,000 people, approximately a third of its population, when the city government abruptly closed WCC after it became public that soil samples from the complex contained more than 90,000 parts per million of lead. Three times higher than the federal safety standards. The EPA advised parents to stop their kids from playing in the dirt, to wash their children's toys regularly and to wash children's hands after they play outside.

64.     For decades, residents of the West Calumet Housing Complex and other residents on and around the Site were exposed to hazardous levels of lead, arsenic, and other contamination as a direct result of emissions and discharges by each Defendant from its facility nearby.

**Carrie Gosch Elementary School**

65.     Carrie Gosch Elementary School was a regular public school that was located at 4001 Indianapolis Blvd, East Chicago, IN 46312. It was one of the schools in the School District of East Chicago.

66.     Carrie Gosch Elementary School had an enrollment of 470 students in grades Pre-

K to 8th grade.

67.　　In August 2016, the East Chicago Indiana District shut down the Carrie Gosch Elementary School because the grounds were contaminated with lead.

68.　　The closing of the Carrie Gosch Elementary School displaced 430 students because it was located adjacent West Calumet Housing Complex situated on the USS Lead EPA Superfund Site.

69.　　For years, the children that attended Carrie Gosch Elementary School were exposed to hazardous levels of lead, arsenic, and other contamination as a direct result of emissions and discharges by each Defendant from its facility nearby.

**EPA Investigations**

70.　　The EPA proposed USS Lead to the National Priorities List ("NPL") on February 7, 1992.

71.　　After the 1992 proposal to the NPL, the EPA determined that the USS Lead facility would be best addressed by the Resource Conservation and Recovery Act (RCRA) program.

72.　　On November 18, 1993, the EPA issued an Administrative Order on Consent to USS Lead under RCRA 3008(h) authority.

73.　　The Administrative Order of Consent was the beginning of more than two decades of EPA involvement at the Site.

74.　　Under the Hazard Ranking System, the Site was evaluated in September 2008; this evaluation determined that there was an observed release of lead in the air-migration pathway as well as in the surface-water migration pathway. The Site was listed as a Superfund site on the National Priorities List on April 8, 2009.

75.　　The EPA continued to investigate potential sources of contamination at the Site.

76.     In August 2005, the EPA sent letters seeking information from parties potentially responsible for the contamination at the Site.

77.     Letters were sent to ARCO, DuPont, and Hammond Lead, as well as others.

78.     On the basis of its preliminary investigations, the EPA sent General Notice of Liability letters to USS Lead, ARCO, DuPont, and possibly other entities.

79.     On September 3, 2014, the United States, acting on request of the EPA and the state of Indiana, filed a complaint against ARCO and DuPont.

80.     On October 28, 2014, ARCO and DuPont entered into a consent decree with the United States agreeing to pay roughly $26 million toward the cleanup of the Site.

## Plaintiffs' Discovery of the Contamination

81.     After decades of silence, on July 25, 2016, East Chicago Mayor Anthony Copeland sent letters to residents of the West Calumet Housing Complex, including the Plaintiffs, stating:

Dear Resident:

Your health and safety are always my first priority.

When the City and the East Chicago Housing Authority ( `ECHA_) recently were informed by the EPA that the ground within the West Calumet Housing Complex was highly contaminated with lead and arsenic, we moved immediately to protect your safety, health, and welfare.

The identification of lead and arsenic poses potential dangers, and that is why I ordered the East Chicago Health Department to offer lead testing to you and your children. Now that we know the levels of lead in the ground in West Calumet Housing Complex, we feel it is in your best interest to temporarily relocate your household to safer conditions. ECHA is asking HUD to provide vouchers for safe, sanitary housing as soon as possible. Even though this may be a great inconvenience to you, it´s necessary to protect you and your children from possible harm.

The staff of ECHA, including the Section 8 staff will be assisting you in the coming days, and we will continue to provide you with information as soon as it becomes available.

We ask for your patience and cooperation in this process.

82.     Prior to the letter, each Plaintiff did not know that he or she had been exposed to hazardous levels of lead or other toxins.

83.     Prior to the letter, each Plaintiff did not know that he or she had been injured by

his or her exposure to hazardous levels of lead or other toxins.

84.     Although the EPA collected samples from the Site and its residences for more than two decades prior, the EPA did not inform Plaintiffs or other residents that they had been exposed to dangerous levels of lead or other toxins.

85.     It was not until early 2016 that the EPA finally delivered the results of its testing to the City of East Chicago.

86.     Prior to Plaintiffs' ultimate discovery of their exposure to hazardous levels of lead or other toxins, each Defendant acted intentionally to conceal from Plaintiffs that each Defendant had discharged, released, and/or caused to be released hazardous substances such as lead arsenic, and other toxins.

**Lead**

87.     Lead affects almost every organ and system in the human body, it can damage organs, cause permanent developmental disabilities, seizures, coma, and even death.

88.     Lead exposure has its strongest effect on children and child brain development.

89.     Lead exposure also increases the risk of the following diseases: Cardiac effects such as myocardial damage, myocarditis; hypertension; gastrointestinal effects; kidney damage, and disease; failure liver effects; blood disorders; neurological effects such as encephalopathy, peripheral neuropathy, paresthesia, numbness and pain; neuropsychological effects, such as memory loss, confusion, mood swings, seizures, and aggression; reproduction effects such as spontaneous abortion and malformations; developmental effects such as decrements in IQ scores, deficits in school performance, learning difficulty, delayed neurodevelopment, growth retardation, attention deficit disorder, and attention deficit hyperactivity disorder.

90.     Lead exposure can damage vision causing cataracts, optic nerve damage, and vision

loss. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253772/

91.     Lead exposure is a causal factor in asthma. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1257653/

92.     Lead exposure is associated with increased risk for sleep problems and excessive daytime sleepiness. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4667382/

93.     Children exposed to even low levels of lead develop difficulties learning, and, if the exposure does not stop, the damage will continue and is permanent.

94.     The Centers for Disease Control and Prevention states that "[n]o safe blood lead level in children has been identified. Lead exposure can affect nearly every system in the body." (https://www.cdc.gov/nceh/lead)

### Plaintiffs' Injuries

95.     Each Plaintiff was exposed to hazardous levels of lead or other toxins while a resident of the Site.

96.     Each Plaintiff has suffered physical, mental, and emotional harm as a direct and proximate result of his or her exposure to the lead or other chemical contamination at the Site.

### CLASS ACTION ALLEGATIONS

97.     Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

98.     The proposed "Class Representatives Plaintiffs" are S.A., C.A.1, C.A.2, D.B.1, and D.B.2, by and through their next of friend and mother Shantell Allen.

99.     Class Representative Plaintiffs bring this action individually and on behalf of all other persons similarly situated as members of the proposed classes and seek to certify and

maintain it as a class action pursuant to Rules 23(a); (b)(1) and/or (b)(2); (b)(3); and (c)(4) of the

Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

A.   **Residents Class:** Persons born on or after December 20, 2002 who: (i) resided at the West Calumet Housing Complex; and/or (ii) enrolled and attended classes at Carrie Gosch Elementary School, including individually named Plaintiffs listed *supra*. ("Residents Class").

B.   **Bodily Injury Class:** Members of the Residents Class who have been diagnosed by a medical professional with and/or treated by a medical professional for one or more of the diseases or conditions associated with exposure to lead, arsenic, and other toxic chemicals as set out in paragraphs 89 through 93 above, including individually named Plaintiffs listed *supra*. ("Bodily Injury Class").

100.   Class Representative Plaintiffs are members of the Bodily Injury and Residents

Classes they seek to represent, as indicated by their factual allegations. This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of

those provisions.

101.   Excluded from the Class are:

a.   Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representatives, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b.   the Judge and Magistrate Judge to whom this case is assigned, those Judges' staffs, and the Judges' immediate families;

c.   any class counsel or their immediate family members; and

d.   all governmental entities.

102.   Class Representative Plaintiffs reserve the right to amend the Class definition if

discovery and further

investigation reveal that any Class should be expanded, divided into additional classes, or modified

in any other way.

## CLASS ACTION ALLEGATIONS – NUMEROSITY

103.    Numerosity of the Class: The members of the classes are so numerous that joinder of each member is impractical within the meaning of Fed. R. Civ. P. 23(a)(1). The exact number of individual claimants will certainly be better established after class notification. However, upon information and belief, there were approximately 346 households in the West Calumet Housing Complex and approximately 265 students that attended the Carrie Gosch Elementary School in any given school year. Class members may be notified of the pendency of this action by regular mail, supplemented, if necessary and required by the Court, by published notice.

## CLASS ACTION ALLEGATIONS – PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT

104.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, satisfying Rule 23(a)(2) and making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class Members. Common legal and factual issues include:

a.      Whether Defendants engaged in the conduct alleged herein.

b.      Whether the operation of Defendants' manufacturing facilities caused the spread of hazardous and toxic materials such as lead and arsenic.

c.      Whether the presence of hazardous substances and/or toxic contamination at the Site are the result of the release, discharge, dumping, and/or any other action by Defendants.

d.      Whether and to what extent the release of hazardous substances and/or toxic contamination, including inter alia: arsenic and lead from the USS Lead contaminated the West Calumet Housing Project and Lake County, Indiana.

e.      Whether Defendants acted reasonably to prevent releases of hazardous substances and/or toxic contamination from the Site;

f.      Whether contaminants from the Site including but not limited to arsenic and lead contaminated soil and groundwater of the West Calumet Housing Project and Lake County, Indiana;

g.      Whether Defendants failed to warn the Plaintiffs and putative class members about the nature, extent, and scope of the contamination at the Site and/or offsite;

i.      Whether the Plaintiffs and putative class members have been exposed to the hazardous substances and/or toxic contamination, and further whether the exposure was greater than normal background levels of various toxic chemicals;

j.      Whether monitoring procedures exist that make early detection of diseases associated with exposure to hazardous chemicals possible;

k.      Whether such monitoring procedures are reasonably necessary according to contemporary scientific principles for Plaintiffs and putative class members who have been exposed to excessive levels of hazardous substances and/or toxic contamination;

l.      Whether the Defendants breached applicable duties to Plaintiffs;

m.      Whether the Defendants were negligent.

## CLASS ACTION ALLEGATIONS – TYPICALITY

105.    Class Representative Plaintiffs' claims are typical of the claims of the members of the class, as required by Fed. R. Civ. P. 23(a)(3). The claims of the Class Representative Plaintiffs of the class are typical because the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the injuries suffered by the Class Representative Plaintiffs are the same kind of injuries suffered by the members of the classes.

## CLASS ACTION ALLEGATIONS – ADEQUACY OF REPRESENTATION

106.    Class Representative Plaintiffs, individually and/or by and through their mother, will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.

107.    Further, Class Representative Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

108. Class Representative Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

### CLASS ACTION ALLEGATIONS – SUPERIORITY

109. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

110. Defendants have acted on grounds generally applicable to the classes, thereby making appropriate final legal and equitable relief with respect to the class as a whole.

111. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the classes to individually redress the wrongs done to them.

112. Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

113. There will be no difficulty in the management of this action as a class action. Plaintiffs' claims are typical of the claims of the members of the classes in as much as all members of the classes are similarly affected by Defendants' misconduct resulting in injury to all members of the Subclasses.

### CAUSES OF ACTION FOR CLASS ACTION
### AND INDIVIDUAL CLAIMS

### COUNT I
### NEGLIGENCE / NEGLIGENCE WITH MEDICAL MONITORING DAMAGES

114. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 97 of the Complaint, as though fully set forth herein.

115. The conduct of each Defendant in its operations resulting in the release of lead and

other hazardous particles created a risk of injury and/or damage to others, specifically the Plaintiffs.

116.　　Each Defendant had, and has, a duty of care to take reasonable measures to prevent the injury and/or damage to others resulting from its operations on and around the Site.

117.　　Each Defendant had, and has, a duty to prevent the release of hazardous substances such as lead and other hazardous particles from escaping its property and control.

118.　　Each Defendant had, and has, a duty to monitor its operations to ensure that the operations were not resulting in the accumulation of hazardous substances such as lead and other hazardous substances.

119.　　Each Defendant had, and has, a duty to control and maintain their operations on and around the Site in a non-polluting manner.

120.　　Each Defendant had, and has, a duty not to permit or allow hazardous substances to invade properties of others.

121.　　Each Defendant had, and has, a duty to respond promptly to any release of contaminants in a manner that would prevent or mitigate further migration of contaminants.

122.　　Each Defendant had, and has, a duty under the statutes and regulations promulgated by the State of Indiana and its agencies to prevent, contain, and remediate the discharge and/or release of hazardous substances such as lead and other hazardous substances.

123.　　Each Defendant had, and has, a duty to warn foreseeable persons who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other hazardous substances.

124.　　Plaintiffs were foreseeable persons to each Defendant who would be expected to be harmed by the discharge and/or release of hazardous substances such as lead and other

hazardous substances.

125.    Contaminants of the type discovered in soil in and around the Site do not naturally accumulate in the amounts discovered in the absence of negligent conduct.

126.    The unnatural concentrations of lead and other hazardous substances in the soil in and around the Site can only be the result of human intervention through industrial processes.

127.    Each Defendant exercised exclusive management and control over the lead and other hazardous particles prior to their release and subsequent contamination on and around the Site.

128.    The danger posed by release of hazardous substances such as lead and other hazardous substances is extremely high, necessitating an elevated, proportional degree of care.

129.    Upon learning of the migration of the contaminants, each Defendant had, and has, a duty to take action to stop migration and remediate the contamination.

130.    Each Defendant has breached its duties by its negligent acts and omissions in operating and maintaining its operations on and around the Site, by failing to implement safeguards to assure against the release of hazardous substances such as lead and other hazardous substances, failing to promptly and effectively address the release of hazardous substances such as lead and other hazardous substances, and by failing to prevent migration of contaminants such as lead and other hazardous substances.

131.    Each Defendant actually knew or should have known that lead and other hazardous particles have the potential to cause serious harm to the Plaintiffs.

132.    As a direct and proximate result of each Defendant's breach of its duties, Plaintiffs have suffered and continue to suffer financial, physical, mental, and emotional damages.

133.    Plaintiffs were each foreseeable persons to suffer the exact type of injuries that each

has suffered as a result of each Defendant's release of hazardous substances.

134. Each Plaintiff has suffered financial, physical, mental, and emotional damages stemming directly from their exposure to lead particles, discharged by each Defendant.

135. As a direct and proximate result of the Defendants' acts, omissions, and conduct as set forth in this Complaint, Plaintiffs have suffered and continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress. This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of the Plaintiffs' health and to monitor their status for changes and progressions in their injuries and their sequelae.

136. The state Indiana recognizes Medical Monitoring as a facet of damages for Plaintiffs' negligence claims. *Gray v. Westinghouse Elec. Corp*., 624 N.E.2d 49, 54 (Ind. Ct. App. 1993), trans. denied*; Allgood v. General Motors Corp*., No. 102cv1077, 2005 U.S. Dist. LEXIS 43693, *9–23, 2005 WL 2218371 (S.D. Ind. Sept. 12, 2005) (Hamilton, J.); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 2924, 2021 U.S. Dist. LEXIS 122583, at *30–32 (S.D. Fla. June 30, 2021).

137. Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death. Furthermore, these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

138. Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible and beneficial. For

example, administration of these readily available non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory ailments, and heart dysfunction, even in asymptomatic individuals. Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these Plaintiffs would suffer if diagnosis and/or treatment were delayed until their conditions became overtly symptomatic.

139. The recommended testing procedures will be subject to expert testimony at the time of trial.

140. Plaintiffs are at a high risk for latent and progressive respiratory injuries and therefore need to undergo testing. Plaintiffs also need the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of latent injuries, which will result in even more grave injuries and consequences.

141. Plaintiffs' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes, schools, businesses, and other public places in East Chicago, can only be mitigated and/or addressed by the creation of a medical program.

142. To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants, especially lead into the air, soil, and water around the Plaintiffs, thereby entering and injuring Plaintiffs' physical and mental well-being, Defendants are jointly and severally liable for all damages from contamination in this case.

**COUNT II**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

143. Plaintiffs repeat, reallege, and incorporate by reference paragraphs 1 through 127 of the Complaint, as though fully set forth herein.

28

144.     Defendants had a duty to Plaintiffs not to permit or allow hazardous substances from Defendants' facilities to contaminate Plaintiffs' properties and expose Plaintiffs to such substances. Defendants also had a duty to promptly respond to and remediate any releases of hazardous contaminants in a manner that would prevent further threats to Plaintiffs' health and properties, and to warn Plaintiffs of the release or threatened release of hazardous substances into or towards the soil used by Plaintiffs. The facilities, and hazardous substances generated therefrom, were within Defendants' exclusive control.

145.     Defendants breached these duties by their negligent acts and omissions in operating and maintaining their facilities; their handling, storage, use, and disposal of hazardous substances; their failure to promptly and effectively address such contamination to prevent further threats to the Plaintiffs' health and properties once known; and their failure to warn Plaintiffs of the release and/or threatened release of toxic contaminants.

146.     Defendants' breach caused hazardous lead, arsenic, PAHs, and other contaminants to directly impact Plaintiffs.

147.     The contamination has caused Plaintiffs significant emotional distress, including: (a) fear of contracting a future illness associated with the contamination; (b) fear that their children, grandchildren, family members, guests, or anyone else who comes into contact with their homes will contract future illnesses associated with the contamination; and (c) fear that the contamination has affected their health.

148.     The state Indiana recognizes Medical Monitoring as a facet of damages for the Plaintiffs' negligent infliction of emotional distress claims. *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, 54 (Ind. Ct. App. 1993), *trans. denied; Allgood v. General Motors Corp.*, No. 102cv1077, 2005 U.S. Dist. LEXIS 43693, *9–23, 2005 WL 2218371 (S.D. Ind. Sept. 12, 2005)

(Hamilton, J.); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 2924, 2021 U.S. Dist. LEXIS 122583, at *30–32 (S.D. Fla. June 30, 2021).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court do the following:

A. Certification of the proposed Classes;

B. A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton and careless disregard for the health and safety, of Plaintiffs;

C. An order establishing a medical monitoring protocol for Plaintiffs;

D. An order for an award of attorney fees and costs, as provided by law;

E. Pre-judgement and post-judgement interest as provided by law;

E. An award of damages for the personal injuries, pain, and suffering each Plaintiff has endured;

F. An award of punitive damages against each Defendant; and

G. For all other just and proper relief.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand trial by jury.

Respectfully submitted,

/s/ *Eric S. Pavlack*
Eric S. Pavlack, #21773-49
Colin E. Flora, #29914-49
PAVLACK LAW, LLC
50 E. 91st St., Ste. 305
Indianapolis, IN 46240
(317) 251-1100
(317) 252-0352 *fax*
Eric@PavlackLawFirm.com
Colin@PavlackLawFirm.com

Paul J. Napoli, *pro hac forthcoming*

Coral Marie Odiot-Rivera, *pro hac forthcoming*
Veronica Natalia Vázquez Santiago, *pro hac forthcoming*
Cristina Marie Rodríguez Torres, *pro hac forthcoming*
NAPOLI SHKOLNIK
1302 Ponce de Leon Ave.
Santurce, P.R. 00907
(787) 493-5088 Ext. 1002
[Fax] 646-843-7603
*pnapoli@nsprlaw.com*
*codiot@nsprlaw.com*
*crodriguez@nsprlaw.com*
*vvazquez@nsprlaw.com*

Walter J. Alvarez, #2383-45
Brock Alvarado, #16348-45
Steven J. Alvarez, #30278-45
WALTER J. ALVAREZ, P.C.
1524 West 96th Ave.
Crown Point, Indiana 46307
(219) 662-6400
(219) 6626410 *fax*

***Attorneys for Plaintiffs and the Proposed Classes***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed with the Court's ECF system on December 20, 2022. A copy will be sent electronically to all counsel of record by operation of the ECF system.

/s/ *Eric S. Pavlack*
Eric S. Pavlack